**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**ANDREA CALHOUN,**

        **Plaintiff,**

  **v.**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

**Case No. 2:17-cv-33**

**Magistrate Judge Elizabeth P. Deavers**

## OPINION AND ORDER

Plaintiff, Andrea Calhoun, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 17), the Commissioner's Memorandum in Opposition (ECF No. 18), and the administrative record (ECF No. 10). Plaintiff did not file a Reply in this matter. For the reasons that follow, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND

Plaintiff filed her application for benefits on August 12, 2013, later amended to allege that she has been disabled since April 26, 2012. (R. at 195-196, 204, 212.) Plaintiff alleges disability from a chronic shoulder pain, depression, anxiety, arthritis, fibromyalgia, migraines, sleep apnea, chronic fatigue, chronic knee pain in both knees, and joint and muscle weakness. (R. at 97.) Plaintiff's applications were denied initially and upon reconsideration. (R. at 135-138, 142-148.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 151-157.)

Administrative Law Judge Victoria A. Ferrer (the "ALJ") held a hearing on December 4, 2015, at which Plaintiff, represented by counsel, appeared and testified. (R. at 43-58.) Vocational Expert George Paprocki (the "VE") also appeared and testified. (R. at 58-65.) On March 2, 2016, the ALJ issued a decision finding that the Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 16-28.) On November 14, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-3.) Plaintiff then timely commenced the instant action. (ECF No. 1.)

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that she last worked seven years ago as an account manager for Xerox, where she was fired following surgery on her left knee. (R. at 43-44.) Plaintiff also testified that she has not tried to find another job since then because of increasing problems with knee pain, shoulder pain, depression, anxiety, and sleeplessness. (R. at 44.)

Plaintiff stated that she lives with her husband and two teenage children. (*Id*.) According to Plaintiff, her arm pain prevents her from vacuuming, and her knee and back pain prevent her from performing other household chores. (R. at 45.) Plaintiff testified that until recently, her sister would do work around the house for her. (*Id*.) Plaintiff also testified that she is able to dress herself and brush her teeth, but she cannot wash her hair because she "can't lift [her] arms above [her] shoulders long enough to wash it and dry it." (*Id*.) Plaintiff further testified that she had surgery on both shoulders, which "took away the constant stabbing pain and gave me a little more mobility . . .. But they're still very weak, and very achy from the arthritis." (R. at 46.)

Plaintiff stated that she has difficulty lifting pots and pans and handling spoons or tongs. (*Id.*) Plaintiff opined that, at most, she could lift a gallon of milk using both hands. (*Id*.)

Plaintiff testified that she shops for groceries with her husband or children so they can take items off the shelves for her. (R. at 47.) Plaintiff also testified that she has trouble bending down because of knee weakness, back pain, and shoulder pain. (*Id*.) Plaintiff further testified that she can walk "maybe four houses and back." (R. at 48.) Plaintiff stated that she used to have hobbies like roller skating, bike riding, and tennis, but that she has not done any of them in approximately nine years. (*Id*) Plaintiff also stated that she takes anti-inflammatories every day and sometimes Oxycodone. (*Id*.) Plaintiff further stated that she treats with ice almost daily, particularly her left knee, and receives injections in her knee. (R. at 49-50.)

Plaintiff testified that the worst pain she has is in her knees, but that she also has problems with swelling in her toes, ankles, shoulders, and neck. (R. at 49.) Plaintiff also testified that when she sits, her knees feel tight and swollen and she gets burning sensations in her back. (R. at 50.) According to Plaintiff, she cannot go shopping at the mall with her family because she "can't walk long enough." (*Id*.) When asked about her primary care physician's March 2014 assessment that she can stand or walk up to one hour at a time, Plaintiff stated that she did not agree. (R. at 51.) Plaintiff also stated that should sit for "probably 45 minutes" at a time. (R. at 52.) Plaintiff testified that activity causes pain and swelling in her knee to increase. (R. at 56-57.) Plaintiff also testified that, on a scale of ten, her shoulder pain is usually a six and her knee pain starts at a four or five in the morning but goes up to ten by the end of the day. (R. at 57.)

Plaintiff testified that she gets migraines monthly that last about four days. (R. at 52-53.) According to Plaintiff, the medication she takes for her migraines lessen their intensity but make her drowsy and sleep. (R. at 52.) Plaintiff stated that, when she has a migraine, she gets nausea, loses her appetite, and becomes irritable. (R. at 53.) Plaintiff also testified that she suffers from anxiety and depression. (*Id*.) According to Plaintiff she has friends in Cleveland who visit her a couple of times per year, but that she generally does not socialize. (*Id*.) Plaintiff testified that she does not attend her high school junior's basketball games and did not attend her older son's school events. (R. at 54-55.) Plaintiff stated that she takes Brintellix and Temazepam for her mental health conditions, but that she is unable to get more than a few hours of sleep nightly because of bad dreams, pain, and a racing mind. (R. at 55.) According to Plaintiff, a few days per week she wakes up so tired that she does not shower or change out of her pajamas and falls back asleep around ten o'clock. (R. at 56.)

## B. The VE's Testimony

At the hearing, the ALJ stated that he determined that Plaintiff has past relevant work as a an office machine sales representative, a job at the medium exertional level. (R. at 59.) The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 59-64.) Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could not perform her previous work. (R. at 60.) The VE testified that such a hypothetical person, with limitations to occasional handling and frequent fingering with the hands bilaterally, could engage in work as a surveillance system monitor, a sedentary job that exists in the state and national economy. (R. at 61.) According to the VE, a hypothetical person without those additional limitations, could

perform work as a toy assembler or a fishing rod assembler, jobs at the light exertional level, that exist in the regional and national economy. (R. at 62.)

### III. MEDICAL RECORDS

### A. Gerald M. Rosenberg, M.D. and Nathaniel K. Long, D.O.

On February 27, 2008, Plaintiff underwent an arthroscopic procedure to repair her left medial meniscus. (R. at 279.) Dr. Long reported an unremarkable suprapatellar pouch, a largely pristine undersurface of the patella, and a small area of grade 2-3 chondromalacia. (R. at 280.) Dr. Long also reported that Plaintiff's patella tracked well in the femoral groove with flexion and extension of the knee. (*Id*.) He found the femoral groove and the notch largely unremarkable, an unremarkable lateral compartment, and an area of grade 3 chondromalacia in the medial femoral condyle. (*Id*.) Dr. Long reported a very small tear in the posterior aspect of the medial meniscus, but stated that the rest of the medial compartment was unremarkable and the tibial plateau was in excellent condition. (*Id*.)

On March 10, 2009, Plaintiff underwent left knee arthroscopic debridement and chondroplasty, as well as lateral retinacular release. (R. at 281.) Dr. Rosenberg observed that the chondromalacia on the medial femoral condyle addressed in Plaintiff's previous procedure "had healed over nicely." (*Id*.) He found "a flap of exuberant cartilage," but noted that "there was no significant pathology of the medial meniscus or throughout the medial compartment." (*Id*.) Dr. Rosenberg found the lateral compartment "pristine," no significant tearing of the meniscus, and intact articular surfaces." (R. at 281-282.) Dr. Rosenberg noted that Plaintiff had "a very tight patellofemoral space and she had very significant chondromalacia of the patella." (R. at 282.)

On November 26, 2012, Plaintiff saw Dr. Long who diagnosed her with left patellofemoral syndrome and right rotator cuff tendinitis with symptomatic osteoarthritis of the AC joint. (R. at 359.) On December 13, 2012, Plaintiff underwent right arthroscopic subacromial decompression, distal clavicle resection, and an extensive debridement. (R. at 381.) Dr. Long found a pristine glenohumeral joint, circumferential fraying involving the glenoid labrum, "very low-grade partial thickness tearing involving the articular side of the rotator cuff," excellent bursal side rotator cuff, and degenerative distal end of the clavicle.. (R. at 382.)

On January 16, 2013, Plaintiff saw Dr. Long for her shoulder pain. Plaintiff reported having a "very good" quality of life, but stated she was unable to lift and reach with her right shoulder. (R. at 294.) Upon examination, Dr. Long found moderate decreased joint mobility. (R. at 295.) Dr. Long opined that Plaintiff's condition could improve. (R. at 296.)

Plaintiff returned on February 13, 2013, and reported that she had been to only one physical therapy appointment in the previous two or three weeks. (R. at 357.) Dr. Long gave her a Kenalog injection in her right shoulder and prescribed continuing physical therapy. (*Id*.)

On June 3, 2013, Plaintiff again saw Dr. Long. He reported that Plaintiff had full range of motion in both shoulders, weaker on the right than left with "a great deal of pain" above ninety degree abduction and forward elevation on the left side. (R. at 384.) Dr. Long also reported, no gross instability, tenderness to palpation in the AC joint, and a full range of motion in Plaintiff's elbow, wrist, and fingers. (R. at 384.) On August 5, 2013, Plaintiff saw Dr. Long again for her shoulder pain. She reported discontinuing physical therapy because it bothered her left shoulder. Dr. Long's observations were unchanged from Plaintiff's previous visit. (R. at 383, 384.) On September 16, 2013, Plaintiff again saw Dr. Long who noted that she had full

range of motion in both shoulders "with reasonable strength against resistance, a great deal of pain above 90 degrees of abduction as well as forward elevation." (R. at 396.) He noted full range of motion in both elbows, wrists, and fingers. (*Id.*)

On December 5, 2013, Plaintiff underwent left arthroscopic subacromial decompression, distal clavicle resection, extensive debridement, and right shoulder injection. (R. at 427.) Dr. Long observed pristine joint surfaces and biceps tendon, low-grade partial-thickness tearing involving the undersurface of the supraspinatus insertion, and circumferential degenerative tearing involving the glenoid labrum. (R. at 428.) Dr. Long found a "very large" acromion in the subacromial space and a "quite degenerative" distal end of the clavicle. (*Id.*)

On March 3, 2014, Plaintiff again saw Dr. Long who found full range of motion in both shoulders, "appropriate" strength in her left shoulder, no obvious instability, and full range of motion in her elbows, wrists, and fingers. (R. at 451.)

**B. John C. Novak, M.D.**

On September 12, 2011, Plaintiff saw Dr. Novak for complaints of "whole body pain." (R. at 404.) Upon examination, Dr. Novak found that she has "5/5" strength in shoulder abduction, elbow flexion, finger abduction, hip flexion, knee extension, and ankle dorsiflexion. (R. at 405.) He noted slight elbow extension weakness on the right compared to the left, "but only mildly so." (*Id.*)

**C. Connie Ann McCoy, D.O.**

Dr. McCoy saw Plaintiff on December 12, 2010, and noted mildly tender fibromyalgia points, crepitus in Plaintiff's knees bilaterally, and "normal" joints. (R. at 406.)

On May 17, 2012, Plaintiff again saw Dr. McCoy complaining of back pain, joint pain, joint swelling, muscle cramping and weakness, stiffness, arthritis, and fatigue. (R. at 482.) Dr. McCoy diagnosed generalized arthritis. (R. at 483.) On May 23, 2012, Dr. McCoy wrote a letter to the consulting rheumatologist questioning whether Plaintiff might have a connective tissue or autoimmune condition. (R. at 490.)

On October 16, 2013, Dr. McCoy completed a medical source statement. Dr. McCoy stated that, over the previous seven and a half years, Plaintiff experienced decreasing range of motion, increasing pain, increasing depression and fatigue, and decreasing motivation. (R. at 392.) She characterized Plaintiff's conditions as intolerant to medications with poor response to physical therapy and surgery. (R. at 393.) Dr. McCoy reported that Plaintiff is unable to stand or walk without pain and opined that she needs to change position frequently and that fatigue limits Plaintiff's function and concentration. (*Id.*)

On January 28, 2014, Dr. McCoy saw Plaintiff and noted no joint tenderness, swelling, or erythema or edema. (R. at 620.) Dr. McCoy also noted "5/5" strength in upper and lower extremities bilaterally. (*Id.*)

On March 27, 2014, Dr. McCoy completed a medical source statement regarding Plaintiff's physical capacity. Dr. McCoy opined that Plaintiff can lift twenty pounds occasionally and ten pounds frequently, stand and/or walk one hour total within an eight-hour workday, and sit four to six hours in a workday but no longer than one hour without interruption. (R. at 672.) Dr. McCoy also opined that Plaintiff can rarely climb, balance, stoop, crouch, kneel, crawl, push, or pull; occasionally reach or perform gross manipulation; and, frequently perform fine manipulation. (R. at 672-673.) Dr. McCoy further opined that Plaintiff experiences severe

pain that interferes with her concentration, takes her off task, and causes absenteeism. (R. at 673.) Dr. McCoy concluded that Plaintiff needs to be able to elevate her legs ninety degrees at will and requires unscheduled rest periods during an eight-hour workday outside the standards thirty-minute lunch and two fifteen-minute breaks. (*Id.*)

On December 4, 2015, Dr. McCoy wrote a letter stating that Plaintiff's osteoarthritis, fibromyalgia, and chronic joint pain and weakness

> have impaired her ability to function in a work environment. Repetitive movements will cause increased pain and weakness in muscle and joints that affect both fine motor and gross motor abilities. This has not caused issue with numbness or loss of feeling but does affect the handling of objects.

(R. at 262.) On May 6, 2015, Dr. McCoy opined that Plaintiff is "working unable." (R. at 661.)

## D.  B. Rodney Comisar, Jr., M.D.

On January 9, 2013, Plaintiff saw Dr. Comisar for her knee pain. Dr. Comisar reported that Plaintiff "walks unassisted without a limp." (R. at 267.) He also reported that Plaintiff can partially squat with retropatellar pain in each knee. (*Id.*) He found trace quadriceps atrophy in Plaintiff's left leg, but no extensor lag. (*Id.*) Dr. Comisar also found mild patellofemoral crepitus on the left and moderate on the right. (R. at 268.) Dr. Comisar further found that Plaintiff has a positive patellar grind test on the left with an equivocal test on the right. (*Id.*) He reported that Plaintiff stands in neutral to slight varus bilaterally in the frontal plan and in neutral bilaterally in the sagittal plane. (*Id.*) Dr. Comisar interpreted imaging results to show moderate patellofemoral and minimal medial compartment narrowing on the left, minimal medial and patellofemoral narrowing on the right, and minimal degenerative changes with medial compartment narrowing. (*Id.*) Dr. Comisar diagnosed moderate left knee patellofemoral arthritis with substantial aggravation. (*Id.*)

On January 17, 2013, Plaintiff underwent a non-contrast MRI of her left knee.  The MRI revealed intact medial and lateral menisci with normal morphology.  (R. at 276.)  The MRI also revealed no ligament or tendon abnormalities.  (*Id*.)  The MRI also revealed fluid in the knee joint, no intraarticular loose bodies or Baker's cyst, mild degenerative changes to the knee.  (R. at 276-277.)

On April 8, 2015, Plaintiff again saw Dr. Comisar for evaluation of her knee pain.  Dr. Comisar found Plaintiff has discomfort with resisted left straight leg raise and pain with resisted knee extension from a flexed position.  (R. at 663.)  He also found symmetric range of motion, no joint line tenderness or compression pain, moderate patellofemoral crepitus on the left and mild on the right, mildly positive left patellar grind test, no bursal or popliteal fossal soft tissue swelling, symmetric patellar mobility, tight left lateral retinacular restraints, and stable ligaments.  (*Id*.)  Imaging revealed moderate patellofemoral and minimal medial and lateral compartment narrowing on the left and minimal tricompartmental narrowing on the right.  (*Id*.)  Dr. Comisar advised Plaintiff that "[s]he can be as active as she is able but should not push through pain with respect to her workouts or any bent knee, impact and climbing activities."  (R. at 664.)

**E.  Herbert Grodner, M.D.**

At the request of the state agency, Herbert Grodner, M.D., examined Plaintiff on December 9, 2013, four days after her December 5, 2013, shoulder surgery that involved depression and resection with extensive debridement of her left shoulder.  (R. at 432-439.)  Plaintiff came to her consultative exam in a sling and in significant pain from the recovery process.  (R. at 436.)  Plaintiff  reported her right shoulder surgery and complained to Dr.

Grodner of decreased range of motion and residual pain when gripping with her right hand. (*Id*.). Plaintiff also reported arthritis in both knees and trouble squatting, kneeling or rising from a chair due to arthritis in both knees. (*Id*.) Plaintiff stated she had problems with her hands, morning stiffness and chronic fatigue due to fibromyalgia. (R. 436.)

Upon examination, Dr. Grodner found a slow, deliberate gait, but he noted that Plaintiff did not require the use of a cane or other ambulatory aid. (R. at 437). Although Plaintiff could not squat and had difficulty with toe and heel walking, Dr. Grodner observed symmetrical deep tendon reflexes, no sensory deficit, and no motor deficits. (*Id*.) He found no atrophy or muscle spasm present and noted that "strength [was] 5 out of 5 in all muscle groups." (R. at 432-433, 437.) Plaintiff complained of pain in her left shoulder when gripping; examination revealed normal hands, normal grasp and manipulation, and normal range of motion in her elbows, wrists, and fingers. (R. at 434, 437-438.) Dr. Grodner found that Plaintiff's joints "appear normal without swelling, deformity, or synovitis." (R. at 437.) Dr. Grodner also found some decreased range of motion in the right shoulder and both knees, but range of motion in the left shoulder could not be tested because of Plaintiff's recent surgery. (R. at 433, 435, 437.) X-rays of both knees revealed no evidence of fracture or dislocation, a normal joint space and cartilage interval, no significant spurring, and only "some very mild subluxation." (R. at 438.) Dr. Grodner opined that Plaintiff would have difficulty with activities requiring any type of above-shoulder level activity with her right shoulder such as reaching. (R. at 438.) He also opined that, because of her decreased range of motion in both knees and arthropathy, Plaintiff would have difficulty with any type of prolonged weight bearing, kneeling, and squatting. (*Id*.) He stated that "a significant amount of her discomfort is due to her recent surgery," and concluded that Plaintiff could be

reevaluated after a proper interval to determine whether she is able to perform sedentary activity. (*Id.*)

## F. State Agency Review

On January 17, 2014, non-treating state agency medical consultant Maureen Gallagher, D.O., reviewed Plaintiff's record for the state agency pursuant to her application for benefits. Dr. Gallagher opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of four hours in an eight-hour workday, and sit approximately six hours in an eight-hour workday. (R. at 106.) Dr. Gallagher also opined that Plaintiff could frequently climb ramps/stairs, stoop, kneel, crouch and crawl but never climb ladders, ropes, or scaffolds. (R. at 106-107.)

Upon reconsideration on May 3, 2014, non-treating state agency medical consultant William Bolz, M.D., also reviewed Plaintiff's records. Dr. Bolz opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of four hours in an eight-hour workday, and sit approximately six hours in an eight-hour workday. (R. at 126.) He also opined that Plaintiff can frequently climb ramps and stairs and stoop; occasionally reach overhead bilaterally, kneel, crouch, and crawl; and, never climb ladders, ropes, or scaffolds. (R. at 127-128.)

# IV.   THE ADMINISTRATIVE DECISION

On March 2, 2016, the ALJ issued her decision.  (R. at 16-28.)  At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since April 26, 2012, the amended alleged onset date.  (R. at 18.)

The ALJ found that Plaintiff had the severe impairments of degenerative joint disease in the bilateral shoulders and knees, fibromyalgia, headaches, major depressive disorder, and anxiety.  (R. at 19.)  The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  At step four of the sequential evaluation process, the ALJ found that Plaintiff had the following residual functional capacity ("RFC"):

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
>
> 5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> After careful consideration of the entire record, [the ALJ] find[s] that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could stand/walk for about four hours in an eight-hour workday and sit for about six hours in an eight-hour workday; sit continuously for one hour and stand/walk continuously for one hour; in between the sitting, standing or walking the claimant needs about 5 minutes in the other position; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop and crouch; never kneel or crawl; avoid concentrated exposure to extreme cold; avoid working with hazardous machines with moving mechanical parts; avoid working in high exposed places; avoid working with sharp objects; limited to simple, routine and repetitive tasks; understand, remember and carryout simple instructions; make decisions on simple matters; adapt to occasional changes in the work setting; interact superficially with the public and coworkers and occasionally interact with supervisors.

(R. at 20.)  In reaching this determination, the ALJ gave Dr. McCoy's 2014 opinion evidence "little weight."  (R. at 26.)  The ALJ noted that Dr. McCoy's opinion regarding Plaintiff's limitations is outside Dr. McCoy's area of specialty and contradicts objective diagnostic testing evidence, evidence of Plaintiff's improvement, and other evidence in the record.  (*Id.*)  The ALJ also gave Dr. McCoy's 2015 opinion evidence "little weight" because it opined on the ultimate issue of disability.  (*Id.*)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the [Social Security Administration] fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of*

*Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

### A. The ALJ's Weighing of the Medical Evidence

In her statement of errors, Plaintiff contends that the ALJ's RFC analysis is flawed.

Specifically, Plaintiff argues that the ALJ improperly accorded Dr. McCoy's treating source

opinion evidence "little weight." (ECF No. 17 at 14.) In evaluating a claimant's case, the ALJ

must consider all medical opinions that she receives. 20 C.F.R. § 416.927(c). Medical opinions

include any "statements from physicians and psychologists or other acceptable medical sources

that reflect judgments about the nature and severity of your impairment(s), including your

symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the [claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550

(6th Cir. 2010) (internal quotation omitted).  The Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 f.3d 128, 134 (2d Cir. 1999).  The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).  There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(d).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### 1. Dr. McCoy's 2014 Treating Source Statement

In her opinion, the ALJ listed several *Wilson* factors that influenced her decision not to give Dr. McCoy's 2014 treating source opinion controlling weight.  The ALJ noted, and Plaintiff does not dispute, that Dr. McCoy is not a specialist in the area of orthopedic medicine.  (R. at 26.)  This determination is supported by substantial evidence.  For instance, Dr. Long, who conducted surgeries on Plaintiff's shoulders reported, post-surgery, full range of motion and

appropriate strength in Plaintiff's shoulders and full range of motion in Plaintiff's elbows, wrists, and fingers.  (R. at 451.)    The ALJ also noted that Dr. McCoy's conclusions are not supported by objective diagnostic test evidence.  (R. at 26.)  Dr. Comisar interpreted various knee imaging results as unremarkable or showing only mild to moderate abnormalities.  (R. at 268, 276-277, 663.)  Reviewing x-rays of Plaintiff's knees, Dr. Grodner found no evidence of fracture or dislocation, a normal joint space and cartilage interval, no significant spurring, and only "some very mild subluxation."  (R. at 438.)

The ALJ further noted that Dr. McCoy's opinion evidence directly contradicted other evidence in the record provided by Plaintiff's other treating sources, as well as Dr. Grodner.  (R. at 26.)  This conclusion too is supported by substantial evidence.  In January 2013, Dr. Comisar's examination results were largely unremarkable and revealed mostly mild and moderate issues with Plaintiff's knees.  (R. at 267-268.)    In April 2015, he found symmetric range of motion, no joint line tenderness or compression pain, moderate patellofemoral crepitus on the left and mild on the right, mildly positive left patellar grind test, no bursal or popliteal fossal soft tissue swelling, symmetric patellar mobility, tight left lateral retinacular restraints, and stable ligaments.  (R. at 663.)

In December 2013, Dr. Grodner found Plaintiff to have a slow, deliberate gait, but he noted that Plaintiff did not require a cane or other ambulatory aid.  (R. at 437.)  He also observed symmetrical deep tendon reflexes, no sensory deficits, no motor deficits, no atrophy or muscle spasm, and noted that Plaintiff's "strength [was] 5 out of 5 in all muscle groups."  (R. at 432-433, 437.)  Although Plaintiff complained of pain in her left shoulder when gripping, Dr. Grodner's examination revealed normal hands, normal grasp and manipulation, and normal range of motion

in her elbows, wrists, and fingers.  (R. at 434, 437-438.)  Dr. Grodner also found that Plaintiff's joints "appear normal without swelling, deformity, or synovitis."  (R. at 437.)

### 2.  Dr. McCoy's December 2015 Letter and May 2015 Opinion Statement

The ALJ did not assign any weight to Dr. McCoy's 2015 letter.  A review of the letter reveals that Dr. McCoy did not make any medical judgments in the letter and reserved her comments to general statement.  (R. at 262.)  According to Dr. McCoy, Plaintiff's osteoarthritis, fibromyalgia, and chronic joint pain and weakness "have impaired her ability to function in a work environment," although she does not say in what way or to what extent.  (*Id.*)  Dr. McCoy also states that "[r]epetitive movements will cause increased pain and weakness in muscle and joints that affect both fine motor and gross motor abilities," but she does not opine as to the limitations this pain may or may not cause Plaintiff.  (*Id.*)  Instead, Dr. McCoy's statements merely "address the general relationship" between Plaintiff's conditions and the symptoms they may cause.  *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 n.3 (6th Cir. 2009).  Accordingly, the regulations do not require the ALJ to assign weight or discuss reasons for any weight assigned to Dr. McCoy's 2015 letter.  *Id.*  Similarly, Dr. McCoy's May 2015 opinion that Plaintiff is "working unable" opines on an issue reserved to the Commissioner and is not entitled to deference or any particular weight.  (R. at 26, 661; 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)).

The Court finds, therefore, that the ALJ properly applied the *Wilson* factors with respect to Dr. McCoy's opinion evidence and that substantial evidence supports his conclusion.

## C. The ALJ's RFC Determination

In her second statement of error, Plaintiff contends that the ALJ's RFC set forth in his three hypothetical questions is not supported by substantial evidence. (ECF No. 17 at 18-21.) In particular, Plaintiff argues that the ALJ's RFC is inconsistent with the medical opinion evidence of Dr. Comisar, Dr. Grodner, and Dr. Boz. (*Id.*)

### 1. Dr. Comisar's Opinion Evidence

With respect to Dr. Comisar's opinion evidence Plaintiff argues that the ALJ incorrectly rejected his opinion in finding that Plaintiff can occasionally squat. (*Id.* at 19; R. at 20.) Plaintiff states that Dr. Comisar's opinion requires her to "avoid 'bent knee' activities," such as squatting. (ECF No. 17 at 20.) Dr. Comisar's April 2015 treatment notes do not bear Plaintiff's interpretation. Dr. Comisar, in fact, states that Plaintiff "should not push through pain with respect to any workout activities" and that she "can be as active as she is able but should not push through pain with respect to her workouts or any bent knee, impact and climbing activities." (R. at 664.) Rather than restricting Plaintiff, then, Dr. Comisar's statement authorizes her to be as active as she would like but to refrain from pushing through pain when doing bent knee activities. Dr. Comisar's statement assumes that Plaintiff will engage in bent knee activities, some of which would be pain-free and, thus, permitted. Dr. Comisar's statement is simply a warning to Plaintiff, as she continues with her physical therapy and home exercise program, to let her body be her guide in continuing treatment. It is not an opinion statement regarding her physical limitations. Like Dr. McCoy's letter, therefore, the ALJ need not give it deference or any particular weight. *Allen.*, 561 F.3d at 651 n.3.

### 2. Dr. Grodner and Dr. Bolz's Opinion Evidence

Plaintiff also objects to the ALJ's finding that Plaintiff can engage in overhead reaching, contrary to Dr. Grodner and Dr. Bolz's opinions that Plaintiff could only occasionally do so. (R. at 20; ECF No. 17 at 19.) A review of the ALJ's opinion reveals that she considered medical evidence that contradicted Dr. Grodner and Dr. Bolz's opined limitations. With respect to Dr. Grodner's opinion evidence, his own examination findings were generally unremarkable. (R. at 437-438.) Further, Plaintiff self-reported significant improvement and full range of motion in both shoulders four months later, both of which directly contradict Dr. Grodner's findings. (R. at 451.)

Dr. Bolz's report notes a March 2014 orthopedic exam in which Plaintiff had full range of motion in both shoulders and all upper extremity joints. (R. at 127.) The ALJ also specifically mentioned objective diagnostic imaging showing mild to moderate shoulder issues and a normal hand examination. (R. at 25, 451.) Plaintiff also self-reported, in March 2014, that "overall she was doing better than before the left shoulder surgery." (R. at 24, 451.) Although in many respects the ALJ adopted limitations greater than those opined by the state reviewing physicians, with respect to Plaintiff's ability to perform overhead reaching, objective evidence in the record directly contradicts Dr. Bolz's opined limitations. The credibility of Plaintiff's testimony to the contrary, is generally reserved for the ALJ, and Plaintiff has provided no credible argument for overturning the ALJ's findings, which are supported by substantial evidence. *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).

For the reasons explained above, therefore, the Court finds that the ALJ properly considered all of the medical evidence with respect to Plaintiff's impairments at Step Four of the sequential evaluation process and that substantial evidence supports her RFC. Accordingly, substantial evidence supports his reliance on the VE's testimony in determining that Plaintiff is not disabled. *Casey v. Sec'y of HHS*, 987 f.2d 1230, 1235 (6th Cir. 1993.)

## VII.    CONCLUSION

In sum, from a review of the record as a whole, the Court finds that substantial evidence supports the ALJ's decision denying benefits. Accordingly, the Commissioner of Social Security's decision is **AFFIRMED** and Plaintiff's Statement of Errors is **OVERRULED**. The Clerk is directed to enter final judgment in this case.


Date: March 12, 2018                          ___*/s/ Elizabeth A. Preston Deavers*___
                                                      ELIZABETH A. PRESTON DEAVERS
                                                      UNITED STATES MAGISTRATE JUDGE